**E-FILED**
Thursday, 01 March, 2007  11:58:24 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RTW REFRACTORY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  05-3257 |
| | ) | |
| AMEREN SERVICES COMPANY, | ) | |
| and AMEREN ENERGY | ) | |
| GENERATING COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

This matter comes before the Court on four Motions: Plaintiff RTW Refractory, Inc.'s (RTW) Motion for Summary Judgment (d/e 31) (RTW Motion); Defendants Ameren Services Company (Ameren Services) and Ameren Energy Generating Company's (Ameren Energy) (collectively Ameren or the Defendants) Motion for Partial Summary Judgment (d/e 32) (Ameren Summary Judgment Motion); Ameren's Motion to Bar Plaintiff's Expert Witness–Donald McIntyre (d/e 33) (McIntyre Motion); and Ameren's Motion to Bar Plaintiff's Expert Witness–Michael O. Moseley (d/e 35) (Moseley Motion).  In March and April 2005, RTW twice installed

refractory in the cyclone burners in Unit No. 2 (Unit) at Ameren Energy's Power Plant in Coffeen, Illinois (Power Plant).   RTW seeks summary judgment for amounts it claims are due and owing, plus eighteen percent interest and attorney fees.   The Defendants oppose the Motion.   The Defendants further seek partial summary judgment on their position that RTW is not entitled to eighteen percent interest and attorney fees in any event.   Finally, the Defendants seek to bar two of RTW's expert witnesses, Donald McIntyre and Michael O. Moseley.

For the reasons set forth below, the Moseley Motion is allowed because Moseley's opinion is speculative.   The McIntyre Motion is allowed in part.   RTW may present McIntyre's opinions about the quality of the raw materials used to manufacture the refractory.   McIntyre may also explain the impact of the presence of excess water or steam during the installation and cure of the refractory at issue, and during subsequent use, but only if other evidence first establishes that water or steam was present during these times.   McIntyre has stated no opinions about other matters, including whether excessive water or steam was present during either installation or thereafter.

Both Motions for Summary Judgment are denied.   Issues of fact exist

regarding whether RTW properly performed under the agreement (or agreements) between the parties.  In addition, ambiguities exist in the parties' agreement (or agreements) that preclude summary judgment on the issue of whether RTW may be contractually entitled to eighteen percent interest and attorney fees, in the event it proves that it properly performed its obligations to Ameren.

## STATEMENT OF FACTS

RTW installs refractory.  Refractory is high temperature furnace linings, usually made of clay alumina products.  <u>RTW Motion</u>, attached <u>Deposition Excerpts of Jeffrey Redmon (RTW Redmon Deposition Excerpts)</u>, at 21.  In late December 2003 or early January 2004, a representative of Ameren Services named Steve Nelson telephoned RTW's president Jeffrey Redmon and requested a quote for a blanket order for refractory for the years 2004-06.  <u>RTW Redmon Deposition Excerpts</u>, at 158.  In response, Redmon wrote a letter to Nelson at Ameren Services dated January 20, 2004 (January 20, 2004, Letter).  The letter states, in part:

> We are pleased to submit our proposal to furnish all necessary supervision, labor, equipment, (including air compressors) wages, applicable taxes, withholding, fringes, materials and

freight to install the refractory for a "per ton price" for the 2004-2006 Refractory Installation Contract at the Coffeen Power Station, located in Coffeen, Illinois.

 . . . .

Payment terms:  All RTW invoices will be Lump Sum and final. No partial invoices will be submitted under this contract. Acceptance of all work will be upon completion.  Ameren Services Company shall issue an individual purchase order number or release number for each installation, on each unit, for each outage and shall be considered separately.  Once Ameren Services Company has received RTW's invoice along with a waiver of lien for materials, Ameren Services Company shall make payment in 15 days or less . . . .

Any invoice more than 15 days past the receivership date shall be subject to interest charges accrued at the rate of 18% annually (1.5% monthly, .05% daily).  No retention.  No liquidated damages.

Once the contract is awarded to RTW Refractory, Inc., this letter shall be attached to the contract and shall become part of the working contract.  Any exceptions to this letter shall be submitted in writing to this office within 20 days from the date of this letter.  Any exceptions will be reviewed and considered. Acceptance of Ameren Services Company exceptions will be submitted within 20 days.  This price is valid for 30 days.

In the event it shall become necessary for RTW Refractory, Inc. to retain the services of an attorney for the purposes of enforcing any provisions of this contract, Ameren Services Company shall pay the costs of the court and reasonable attorneys' fees incurred.

RTW Motion, Exhibit A, January 20, 2004, Letter.  Ameren admits that

this proposal was accepted.   Defendants' Answer to First Amended Complaint and Counterclaim of Defendant Ameren Energy Generating Company (d/e 19) (Answer), ¶ 9.

On February 12, 2004, Ameren Services faxed to RTW a document entitled Contract Purchase Agreement Change (2004 Purchase Agreement Change).   RTW Refractory, Inc.'s Response to the Motion for Summary Judgment Filed by the Defendants (d/e 39), attached Affidavit of Jeffrey A. Redmon (Redmon Affidavit), Exhibit D, 2004 Purchase Agreement Change. The 2004 Purchase Agreement Change was on a purchase order form. Ameren Services assigned Contract Number 105457 to the 2004 Purchase Agreement Change.  The information typed on the form stated, "LABOR - FURNISH / INSTALL REFRACTORY IN 2 CYCLONE BOILERS - COFFEEN PLANT."  Id.  The pre-printed form stated, in part:

**ORDER INSTRUCTIONS**
SEE ATTACHED TERMS & CONDITIONS WHICH ARE INCORPORATED HEREIN BY REFERENCE & MADE A PART HEREOF.

Id.  No additional terms are attached to the copy of the 2004 Purchase Agreement Change submitted to the Court.  Also, the January 20, 2004, Letter, is not attached to the 2004 Purchase Agreement Change.

The 2004 Purchase Agreement Change also was not addressed to RTW and did not include a copy of the January 20, 2004, Letter. Rather, the document was addressed to RTW Industrial Maintenance (RTW Industrial), and referenced a prior agreement between Ameren Services and RTW Industrial. RTW Industrial was a corporation formerly owned by the three individuals who currently own RTW. RTW Industrial also installed refractory. According to Redmon, the owners started RTW as a new corporation for accounting reasons. RTW Redmon Deposition Excerpts, at 15-16. Beginning in 1992, RTW Industrial was slowly dissolved and rolled into RTW. Id. No evidence has been submitted regarding the exact nature of the legal relationship, if any, between RTW and RTW Industrial or the extent to which RTW assumed the rights and obligations of RTW Industrial.

The 2004 Purchase Agreement Change stated that the contract term was from August 6, 1999, to December 31, 2004. RTW Industrial had entered into an agreement with Ameren Services on August 6, 1999, to install refractory in the Power Plant for the three year period from 1999 through 2001 (1999 Contract). Redmon Affidavit, Exhibit B. The 1999 Contract was assigned order number 085227. Redmon states that the 1999

Contract expired after one extension. <u>Redmon Affidavit</u>, ¶ 4. He does not indicate the length of the extension. The 2004 Purchase Agreement Change referenced a contract change date of December 17, 2003, but contained no explanation of this reference. Neither RTW nor RTW Industrial installed any refractory for Ameren in 2003. <u>RTW Redmon Deposition Excerpts</u>, at 158.

The next contact between RTW and Ameren came in early December 2004. Ameren Energy representative Tom Milcic called Redmon to ask for a quote for the cost of installation of refractory in the cyclone burners in the Unit at the Power Plant. The installation would occur in March 2005, when the Unit would be out of service for maintenance, repairs and installation of new equipment (the March 2005, outage). <u>Redmon Affidavit</u>, ¶ 10; <u>Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (d/e 41)</u>, attached <u>Affidavit of Thomas Milcic (Milcic Affidavit)</u>, ¶ 3.

The cyclone burners are horizontal cylinders ten feet in diameter in which crushed coal is burned in pre-heated air that is moving at high velocities, of up to 200 miles per hour. The air and burning coal move through the cylinders and into the main fire box of the boiler. The walls of

the cyclone burners contain tubes through which water flows.  The water is heated during the burning process to make steam.  The interior walls of the cyclone burners are covered with refractory to protect the tubing.  The coal burning process also forms a coating of slag on the interior of the refractory which protects the refractory.  The refractory normally wears off over time and must be replaced every one to two years.  See Memorandum in Support of Defendants' Motion to Bar Plaintiff's Expert Witness–Michael O. Moseley (d/e 36), Exhibit A, Moseley Report dated July 13, 2006 (Moseley Report), at 2-3.

Ameren Services specified that Greengun Eclipse-73P refractory (Greengun) would be used for the job.  RTW Redmon Deposition Excerpts, at 48-50.  Greengun is manufactured by Harbison-Walker Refractories Company, which is a part of ANH Refractories Company (ANH).  Greengun is called gunned refractory or plastic refractory because of its plasticity, or ability to be molded to a desired shape.  See RTW Motion, attached Excerpts of Deposition of William Headrick (RTW Headrick Deposition Excerpts), at 102.  Other refractory is pre-cast into specific shapes, or is made of bricks. Brief in Response to Motion to Bar Testimony of Donald A. McIntyre (d/e 42), attached Crowley Expert Report (Crowley

Report), at 1-2. Greengun is called gunned refractory because it is applied through a process called gunning. This appears to be a process in which the material is sprayed, or gunned, onto surfaces through a nozzle or gun. See e.g., RTW Redmon Deposition Excerpts, at 22. In this case, the Greengun would be gunned onto the interior surfaces of the cyclone burners.

A certain amount of the Greengun bounces off during this process. This material is referred to as "rebound." According to Ameren's expert Michael Crowley, Harbison-Walker recommended mixing new Greengun with the rebound and then using the combined material during the remainder of the application process. Crowley Report, at 1.

After being gunned onto the walls, the Greengun must be dried out, or cured, by heating it to 1,100 degrees Fahrenheit, for four hours. The heating causes the material to bond to the cyclone burner walls. See Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (d/e 41) (Defendants' Opposition to Summary Judgment), Exhibit F, Letter from Mike Rzepczynski to Tom Milcic dated January 24, 2005, with enclosures. The bond is called a phosphate bond. Once the Unit is restarted, the heat from the coal fire causes additional chemical changes in the refractory that forms a stronger bond called a

ceramic bond.  The coal fire also creates the slag coating on the refractory.

See RTW Motion, attached Deposition Excerpts of Marla Atterberry, at 41;

RTW Redmon Deposition Excerpts, at 67-68.  See also Defendants'

Opposition to Summary Judgment, Exhibit I, Headrick Report (Headrick

Report), at 7.

On December 2, 2004, Redmon sent a letter to Milcic.  The letter

stated, in pertinent part:

> We are pleased to submit our budget proposal to furnish and
> install approximately 84 tons (12,000 lbs per cyclone) of
> Harbison and Walker Eclipse 73-P with stainless steel fibers on
> Unit No. 2 for the March 2005 outage.
>
>     Budget Estimate                    $267,238.44
>
> . . .  Also attached is a copy of our proposal dated January 20,
> 2004 addressed to Steve Nelson to renew our blanket order up
> through 2006.  Please review this proposal and call me at your
> convenience.

RTW Motion, Exhibit B.  A copy of the January 20, 2004, Letter was

attached.[1]

Milcic called Redmon on December 2, 2004, and told him that he

_____

[1]The copy of the letter submitted include the handwritten changes, discussed
infra, to increase the quantity of refractory to 14,000 pounds per cyclone and the
corresponding increase in price.  The quote reflects the content of the letter without the
handwritten changes.

wanted 14,000 pounds of refractory per cyclone instead of 12,000.  Redmon responded by faxing a copy of the December 2, 2004, letter with handwritten changes that increased the amount of material to 98 tons and the price to $311,778.18.  Redmon sent a revised letter dated December 3, 2004, that reflected the handwritten changes made the previous day. Redmon Affidavit, Exhibits E and F.  A copy of the January 20, 2004, Letter was attached to both letters.

In January 2005, Milcic told Redmon that Ameren wanted RTW to provide the dry-out, or cure of the refractory.  RTW usually did not provide dry-out services.  RTW, however, found a sub-contractor to provide that service.  On February 14, 2005, RTW sent a letter and an email to Milcic. The email said, "Please review the attached letter for updated pricing on Unit 2 Refractory installation (including dryout).  Also note that the material order has been placed on hold until a purchase order is received." Redmon Affidavit, Exhibit H.  The attached letter, dated February 14, 2005 (February 14, 2005, Letter), stated, in part:

> We are pleased to submit our budget proposal to furnish and install approximately 98 tons (14,000 lbs per cyclone) of Harbison Walker Eclipse 73-P with stainless steel fibers on Unit No. 2 for the March 2005 outage.

Material and labor estimate $    311,778.18
Dry-out estimate                          25,564.50

Total Estimate                 $    337,342.68

. . . .

Payment terms are net 30 days.  No retention.  No liquidated damages.  All past due invoices are subject to interest at a rate of 18% annually.

Redmon Affidavit, Exhibit G, February 14, 2005, Letter.  The February 14, 2005, Letter did not mention attorney fees; it did not refer to the January 4, 2004, Letter, and it did not include a copy of the January 4, 2004, Letter as an attachment.

On February 23, 2005, Milcic responded by email.  The email stated:

Purchase Order for the material, application and cure is the same as the blanket order previously issued to RTW:    105457, per your previously attached letter quote.  The Job Request for all of this work is JR48564504.
The JR should be attached to all material and equipment arriving on site as well as all invoicing being billed.

Right now I anticipate scheduling the material shipment as follows:
. . . .

If you have any questions, please contact me at your convenience.

Redmon Affidavit, Exhibit H.

On March 24 and 25, 2005, RTW applied the refractory to the cyclone burners in the Unit at the Power Plant.  Troy Tomlingson from RTW supervised the work.  Tomlingson had twenty-four years experience in installing refractory.  According to Tomlingson, the installation was done properly.  Reply Brief in Support of Plaintiff's Motion for Summary Judgment (d/e 43), attached Expert Report of Troy Tomlingson.[2]  The Power Plant's boiler engineer, Al Becker, inspected the completed work and determined that the refractory looked excellent.  RTW Summary Judgment Motion, attached Excerpts of Deposition of Al Becker, (RTW Becker Deposition Excerpts), at 16.

In early April 2005, Ameren tried to restart the Unit.  During the outage, the Unit's controls had also been replaced.  Thus, the operators were using new equipment during the start-up.  The operators of the Unit had to work out some problems with the new controls during the start-up.  RTW Motion, attached Deposition Excerpts of Terry Olroyd, at 45-46; RTW Becker Deposition Excerpts, at 22.

The start-up of the Unit failed.  The Unit was allowed to cool down,

---

[2]For purposes of these Motions, the Court considers Tomlingson's statements as that of an eyewitness to the installation rather than an expert.  The Court does not address, at this time, whether Tomlingson may testify as an expert at trial.

and then, the cyclone burners were inspected.  Much of the refractory had fallen off the walls of the cyclone burners and many of the burners had water leaks in the tubes in the burner walls.  On April 8, 2005, Ameren officials contacted both RTW and Harbison-Walker about the falling refractory.  Redmon and Mike Rzepczynski, a representative of Harbison-Walker, came to the Power Plant.  According to Redmon, most of the cyclone burners had large amounts of water in them from leaks from the tubing.  Redmon, Milcic, Rzepczynski, and other Ameren officials discussed what to do about the refractory.  Redmon and Rzepczynski recommended patching the refractory.  RTW Redmon Deposition Excerpts, at 323-25.  Milcic and the other Ameren officials decided to install all new refractory.  Milcic states that he told Redmon that he considered the second installation to be warranty work.  RTW Motion, attached Deposition Excerpts of Tom Milcic (RTW Milcic Deposition Excerpts), at 43.  Redmon states that he asked Milcic whether Ameren would pay for a second installation of refractory, and Milcic replied that, "if that refractory was good and you prove it to me, then I'll have to pay for it."  RTW Redmon Deposition Excerpts, at 323.  The parties exchanged no additional documents at this point.

From April 10-16, 2005, RTW installed refractory again on the walls of the cyclone burners.  RTW encountered one difference in the second installation during the cure process.  During the March 2005 cure, the heaters consumed 6,000 gallons of propane to heat the refractory to the required temperature.  During the April 2005 cure, the heaters consumed 4,350 gallons of propane.  <u>Reply Brief in Support of Plaintiff's Motion for Summary Judgment (d/e 43)</u>, attached <u>RTW Report dated June 30, 2005, and entitled Ameren Services Corporation Coffeen Power Station–Coffeen, Illinois, Job Request JR485645 Unit No. 2 Boiler Start-Up Failure</u>, at 3.  After the cure was completed, the refractory again looked good.  <u>RTW Milcic Deposition Excerpts</u>, at 49.

The Unit was then successfully restarted.  The Unit, however, ran into some additional problems during the next several months, including losses of some refractory.  These losses were patched.  <u>See</u> <u>Moseley Report</u>, at 5; <u>Headrick Report</u>, at 1.

RTW sent Ameren an invoice for $573,419.24 for the two installations of refractory.  The invoice broke down the prices as follows: $337,518.30 for the first installation, and $235,900.94 for the second installation. Ameren paid $327,427.05. <u>RTW Summary Judgment Motion</u>,

Exhibit E, <u>Invoice No. 05-1979A (RTW Invoice)</u>.  The rest of the bill has not been paid.  The unpaid amount represents approximately $10,000.00 of the charges for the first installation and all of the charges for the second installation.  <u>Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (d/e 41)</u>, attached <u>Deposition Excerpts of Jeffrey Redmon</u>, at 365-68.  RTW has continued to add interest to the bill at the rate of $163.72 per day.  As of the time of the filing, RTW calculated the amount owed to be $260,433.43.  <u>RTW Summary Judgment Motion</u>, Exhibit E, <u>RTW Invoice</u>.

Ameren and RTW have continued to do business together.  In January 2006, and again in December 2006, Ameren Services issued revised Contract Purchase Agreement Change documents for Contract No. 105457.  <u>Redmon Affidavit</u>, Exhibits I, <u>Contract Purchase Agreement Change dated January 31, 2006</u>, and Exhibit J, <u>Contract Purchase Agreement Change dated December 29, 2006 (collectively the 2006 Change Documents)</u>.  The forms used appear to be the same as the form used for the 2004 Purchase Agreement Change.  The 2006 Change Documents were again issued to RTW Industrial instead of RTW.  Each of the 2006 Change Documents contains a typed statement that: "Contractor shall receive payment as

technically described in Contractor's proposal dated January 20, 2004."

2006 Change Documents, Exhibit I, at 1; Exhibit J, at 1-2.  Both of the

2006 Change Documents refer to additional terms and conditions that are

attached.  The additional terms and conditions are included in the copies

submitted to the Court.  The additional terms state, in part:

> Any reference in this order to Seller's quotation bid, proposal, or other document of Seller does not signify our acceptance of any terms or conditions thereof which are inconsistent with the terms and conditions of this order, unless the referenced document is signed by both parties and expressly states that it supersedes and [sic] inconsistent terms and conditions of the parties' order and acknowledgment forms.
>
> . . . .
>
> Seller warrants that the good and service supplied will conform to applicable specifications, instructions, drawings, data and samples, and will be of good material and workmanship.  These warranties shall be in addition to all other warranties, express, implied or statutory.  Payment, for inspection of or receipt of articles or services shall not constitute a waiver of any breach of warranty.  Seller shall be responsible for all costs incidental to rework or replace defective services or goods including without limitation inbound and outbond freight.
>
> . . . .
>
> The contract shall be construed under the laws of the State of Missouri.

Redmon Affidavit, 2006 Change Documents, Exhibits I & J, Terms and

Conditions.

Both sides have submitted experts' opinions concerning the reasons that the applications of the refractory failed.  RTW submitted the report of Michael Moseley.  Moseley is an engineer with extensive experience with the power plants operated by the Tennessee Valley Authority from 1969 to 2002.  He noted that Ameren personnel, during the April 2005 start-up, did not properly document that they were following correct procedures. Moseley concluded that because the documentation of proper procedures is lacking, Ameren personnel may have improperly forced high velocity air through the cyclone burners and, as a result, the air and the crushed coal in that air scrubbed or scoured the refractory off of the interior walls of the cyclone burners.  Moseley had no data on the velocity of the air in the burners during the April 2005, start-up of the Unit.  He only opined that the possibility existed that the velocity was too high.  Moseley Report, at 6; see Memorandum in Support of Defendants' Motion to Bar Plaintiff's Expert Witness–Michael Moseley (d/e 36), Exhibit D, Excerpts of Deposition of Michael Moseley, at 61.  In his deposition, Moseley also stated that several other factors could have caused the failure of the refractory, including application or materials.  Memorandum in Support of

<u>Defendants' Motion to Bar Plaintiff's Expert Witness–Michael Moseley (d/e 36)</u>, Exhibit E, <u>Excerpts of Deposition of Michael Moseley</u>, at 43.

Ameren submitted the expert reports of Michael Crowley, Ph.D., and William Headrick, Ph.D. Both are chemists who have worked with refractory of various types. Neither had significant experience installing gunned refractory. Also, most of their experience was in the steel, glass, brass, and petrochemical industry, rather than in the electric power generation industry. <u>See</u> <u>RTW Motion</u>, attached <u>Excerpts of Deposition of William Headrick</u>, at 15-17, 94-96, and attached <u>Excerpts of Deposition of Michael Crowley</u>, at 15-17.

Headrick examined samples from the second installation of refractory in April 2005. He did not test samples from the March 2005, installation that failed. <u>Headrick Report</u>, at 1. He found that the material was too porous and had a loss of phosphorous during use. He opined that: "Post operational evidence leads to the conclusion of an installation problem due to the high porosity and lack of structural integrity. Installation problems could be due to excess water in the system, poor gunning procedures or lack of proper cleanup." <u>Headrick Report</u>, at 7. In his deposition, Headrick said that excess water, outdated materials, use of improper additives, or even

dust could cause the refractory to be too porous.    <u>RTW Headrick Deposition Excerpts</u>, at 152, 169-72, 178-80.

Crowley discussed his prior experience with gunned refractory versus refractory that is cast into sections.  He then listed the material he reviewed, and then stated his conclusion.  He opined that: "the refractory lining failure was primarily due to poor application techniques, perhaps coupled with high variability on the part of manufacturer of the product."  <u>Crowley Report</u>, at 4.  He also opined: "I do not believe that a continuous air blast of several hundred feet/min will do any significant damage to a properly cured phosphate bonded plastic refractory.  At near sonic velocities, very poorly bonded refractories might lose some material."  <u>Id.</u>  Crowley did not explain how the evidence he reviewed, or his experience with gunned refractory, led to his conclusions.

RTW secured the opinions of Robert McIntyre to rebut the opinions of Headrick and Crowley.  McIntyre is Managing Director, Operations Technology, at ANH.  McIntyre's only opinion about the specific events at the Power Plant at issue was that the materials used to manufacture the Greengun met specifications and had no material defects.  He included test data on the material supplied by ANH to support this opinion.

20

Memorandum in Support of Defendants' Motion to Bar Plaintiff's Expert
Witness–Donald A. McIntyre (d/e 34), Exhibit A, McIntyre Report
(McIntyre Report), at 3.

The rest of McIntyre's report discusses, in general, the effect of
burning high moisture coal in burners and the effect of water or steam on
refractory.  High moisture coal can generate excessive steam which can
increase porosity of the refractory.  The increased porosity will reduce the
strength of the refractory.  If water is introduced before the cure is complete,
the refractory can pull away from the walls of the burner.  The water can
also weaken the material for a number of other reasons.  Once the refractory
is dried out, water from leaks in the tubes in the walls of the cyclone burners
can turn to steam and crack the refractory.  McIntyre, however, offered no
opinion regarding: (1) whether excessive water or steam was a cause of the
failure of the refractory in the Unit, or if so, (2) the source of any excess
water or steam.  McIntyre Report, at 1-2.

ANALYSIS

I.      MOTIONS TO BAR EXPERTS

The Court first addresses Ameren's Motions to Bar the Testimony of
Moseley and McIntyre.  The Court must evaluate expert testimony to

21

determine its admissibility.  Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  The witness must be an expert based on his experience, education, and other training; the opinions must be based on sufficient data; the opinions must be the product of reliable principles and methods; and the opinions must be based on a reliable application of the principles to the data.  Fed. R. Evid. 702; U.S. v. Parra, 402 F.3d 752, 758 (7th Cir. 2005).

In this case, Moseley opines that Ameren personnel improperly allowed high velocity air into the cyclones which resulted in scouring or scrubbing of the refractory.  The only data on which he relies is the fact that Ameren personnel did not keep accurate records of the procedures followed. That bit of data gives no information about the velocity of the air in the cyclone burners.  As such, Moseley's opinion about the velocity of the air in the burners during start-up is speculative.  The Court will not consider these opinions.  See Cummins v. Lyle Industries, 93 F.3d 362, 367-68 (7th Cir. 1996) (opinion may not be based on subjective belief or unsupported speculation).  The Motion is allowed to bar this opinion.

McIntyre opines that the materials used in the manufacture of the refractory met specifications.  This opinion is supported by his experience

with ANH and by the data attached to his report. The opinion also rebuts an opinion by Crowley that failure may have resulted from variability in the manufacturing process. The request to bar this opinion is denied.

McIntyre, otherwise, provides information about the effect of water and steam generally on Greengun. The statements appear to be accurate and based on information within his experience, education and training. They are also consistent with Headrick's testimony that steam was one factor that could increase the porosity of the refractory. The statements, however, would be confusing to the jury unless other evidence indicated the presence of excessive water or steam in the cyclone burners. In particular, his comments about high moisture coal would be confusing to the jury. No one has presented any evidence of the moisture content of the coal used at the Power Plant. Thus, McIntyre may opine about the quality of the raw materials used to manufacture the Greengun, but RTW may not ask him about his other opinions regarding excessive water and steam without first seeking permission from the Court outside the presence of the jury. At that time, RTW must demonstrate that evidence has been admitted at trial showing the presence of water or steam in the cyclone burners during the relevant time.

RTW also complains about Headrick and Crowley's opinions, but did not file a formal motion to bar their testimony.  At this point, the Court must evaluate their opinions under <u>Daubert</u> and Rule 702 to decide whether to consider their opinions at summary judgment.  RTW argues that Headrick and Crowley are not qualified to opine about the failure of the refractory.  The Court disagrees.  They are experts in the chemistry of refractory and can render opinions about the causes of the failure of such material.

Headrick's opinions are largely limited to problems with the second, April 2005, installation, rather than the March 2005, installation that had to be redone.  His analysis of the second installation provides little information about the first installation.  The only actual data about the first installation on which Headrick relies is the heating records of the cure.  Also, Headrick posits several possible causes of the problems with the second installation and does not identify a specific cause to a reasonable degree of certainty.  He states: "Installation problems could be due to excess water in the system, poor gunning procedures or lack of proper cleanup."  <u>Headrick Report</u>, at 7.  At this point, the Court will consider Headrick's opinions, but only to the extent that he sets forth possible causes for the

failure.

Crowley identifies all the data on which he relied, and gives his opinion about poor gunning procedures or variability in the quality of the refractory, but he does not explain how the data led him to his conclusions. Thus, Crowley does not demonstrate that he has applied scientific principles and methods reliably to the facts of the case to reach his conclusions. Fed. R. Evid. 702 (3). The Court, therefore, will not consider his opinion on the cause of the failure of the refractory at this time.[3] The Court will now address the summary judgment motions.

II.   SUMMARY JUDGMENT

At summary judgment, the movant must present evidence that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The Court must consider the evidence presented in the light most favorable to the non-movant. Any doubt as to the existence of a genuine issue for trial must be resolved against the movant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once the movant has met its burden, the non-movant must present

---

[3]The Court does not address whether Headrick and Crowley may testify at trial. RTW has not moved to exclude their testimony at trial.

evidence to show that issues of fact remain with respect to an issue essential to its case, and on which it will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. at 322; Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A.    Ameren's Motion for Partial Summary Judgment

Ameren asks the Court to determine that RTW is not entitled to attorney fees and interest at the contractual rate of eighteen percent.  RTW may only recover attorney fees and interest at the contractual rate of eighteen percent if the contract between the parties so provides.  See Tri-G, Inc. v. Burke, Bosselman & Weaver, 222 Ill.2d 218, 255, 856 N.E.2d 389, 410 (Ill., 2006); Morris B. Chapman & Associates Ltd. v. Kitzman, 193 Ill.2d 560, 572, 739 N.E.2d 1263, 1271 (Ill., 2000); Children Intern. v. Ammon Painting Co., __ S.W.3d.__, 2006 WL 3589332, at *5 (Mo.App. W.D., 2006); Killion v. Bank Midwest, N.A., 987 S.W.2d 801, 809 (Mo.App. W.D., 1998).[4]  At this point, however, ambiguities in the documents create issues of fact that preclude granting Ameren's request.

_____

[4]The Court references both Missouri and Illinois law because the additional terms attached to the 2006 Change Documents state that the agreement between the parties is governed by Missouri law.  If those terms were included in the 2004 Purchase Agreement Change, then Missouri law may govern this matter.  The relevant principles of law for the two jurisdictions, however, are substantially similar.

The Court must determine the intent of the parties when construing contracts. The Court must look at all the documents that make up the contract to determine the parties' intent. <u>Atlantic Mutual Insurance Co. v. Metron Engineering and Construction Co.</u>, 83 F.3d 897, 901-02 (7th Cir. 1996); <u>GNB Battery Technologies, Inc. v. Gould, Inc.</u>, 65 F.3d 615, 621 (7th Cir. 1995); <u>Intertel, Inc. v. Sedgwick Claims Management Services, Inc.</u>, 204 S.W.3d 183, 196 (Mo.App. E.D., 2006). The January 20, 2004, Letter includes a provision for attorney fees and interest. Ameren admits that this proposal was accepted. This supports the inference that RTW is entitled to contractual interest and attorney fees, should it prevail on its claim.

The January 20, 2004, Letter, however, also states that the parties will enter into a separate contract and states that the Letter will be attached to the working contract. The 2004 Purchase Agreement Change seems to respond to the January 20, 2004, Letter, but the January 20, 2004, Letter is not attached. This creates an ambiguity concerning whether the parties intended to modify the agreement embodied by the January 20, 2004, Letter. <u>See</u> <u>e.g.</u>, <u>Lunceford v. Houghtlin</u>, 170 S.W.3d 453, 464, (Mo.App. W.D., 2005); <u>Schwinder v. Austin Bank of Chicago</u>, 348 Ill.App.3d 461, 468-69, 809 N.E.2d 180, 189 (Ill.App. 1st Dist., 2004). Also the 2004

27

Purchase Agreement Change references additional terms and conditions that have not been presented to the Court. Without those terms, the Court cannot ascertain the terms of the agreement, if any. The 2004 Purchase Agreement is also addressed to RTW Industrial, not RTW. This creates a further ambiguity. Last, the 2004 Purchase Agreement Change gives an extension date to December 31, 2004, before the March 2005, installation.

The next documents that may embody the parties' agreement are the December 2004, letters from Redmon to Milcic. Those have the January 20, 2004, Letter as an attachment. Milcic asked for a revision to add the dry-out to the agreement. Redmon responded with a revised proposal on February 14, 2005. This revision did not include the January 20, 2004, Letter as an attachment, omitted the reference to attorney fees, but retained the eighteen percent interest provision. The differences between the December 2004, letters and the February 14, 2005, Letter create an ambiguity; RTW could have intended to modify its proposal to drop the attorney fee provision, or it could have only meant to adjust its bid to include the cost of the dry-out. The ambiguity precludes granting summary judgment to either party on the issue of attorney fees for the March 2005, installation.

Milcic responded by accepting the proposal and referencing the Contract Number 105457, the same contract number on the 2004 Purchase Agreement Change. This reference supports the inference that the parties viewed the order to be part of an ongoing relationship governed by the discussions in the beginning of 2004. The problem is that neither the 2004 Purchase Agreement Change nor the February 14, 2005, Letter included a copy of the January 20, 2004, Letter that contained the attorney fee provision. In light of the ambiguities in the documents, an issue of fact exists concerning whether the attorney fee provision was included in the agreement to install the refractory in March 2005.

The contractual term that imposed eighteen percent interest on the unpaid balance, however, was included in all of Redmon's proposals for the March 2005, installation, including the February 14, 2005, Letter that was accepted. This term, therefore, was part of the parties' agreement for the March 2005, installation. Ameren has not paid approximately $10,000.00 of the bill for the first installation. If RTW can establish a right to payment of the $10,000.00, it is also entitled to contractual interest at eighteen percent on that unpaid balance.

The parties executed no documents at the April 2005, meeting in

which RTW agreed to install the refractory the second time.  RTW argues that this installation was governed by the ongoing agreement of the parties embodied in the January 20, 2004, Letter.  Ameren disputes this.  The testimony by Milcic that he considered the work to be warranty work also supports the inference that he believed RTW was performing the second installation as part of its contractual obligation under the agreement for the March 2005, installation.  This would imply that the same contractual terms continued to apply.  RTW's billing for both installations, however, indicates that it viewed the April 2005, installation as a second order.  Given the inconsistent evidence regarding the transaction, an issue of fact exists regarding whether the terms of the March 2005, installation applied to the April 2005, installation.

RTW argues that Ameren admitted in its Answer that it accepted the the proposal in the January 20, 2004, Letter, which contained the attorney fee and eighteen percent interest provisions.  That is true, but the parties may thereafter modify their agreement.  See e.g., Lunceford, 170 S.W.3d at 464; Schwinder, 809 N.E.2d at 189.  The January 20, 2004, Letter states that it is to be attached to the "working contract".  It was not attached to the February 14, 2005, Letter or the 2004 Purchase Agreement Change.

30

This fact may indicate that the parties intended to create a new or modified agreement that was not based on the January 20, 2004, Letter.  Also, the February 14, 2005, Letter includes the eighteen percent interest clause, but does not include the attorney fee clause.  This further supports an inference that the parties modified their ongoing agreement.  At a minimum, these ambiguities create issues of fact that preclude summary judgment.

RTW also relies on the 2006 Change Documents to support its view of an ongoing contractual relationship governed by the January 20, 2004, Letter.  Those documents reference the January 20, 2004, Letter and are also issued under Contract Number 105457.  This also supports the view of an ongoing contractual relationship; however, they may represent a modification of the agreement to incorporate the terms of the January 20, 2004, Letter into the contract.  The January 20, 2004, Letter was not referenced in the 2004 Purchase Agreement Change.  Given the ambiguities in the documents, the Court cannot ascertain the intent of the parties with respect to a contractual right to: (1) attorney fees for either installation and (2) eighteen percent interest for the second installation.  Partial summary judgment is denied.

B.   RTW's Summary Judgment Motion

RTW asks for summary judgment on its right to payment.  It argues that the contract was an "as is" contract.  RTW also argues that Ameren cannot prove that RTW breached the agreement.  Neither argument is persuasive.

Contractors such as RTW impliedly warrant that their work will be performed in a reasonably workmanlike manner.  <u>Korte Const. Co. v. Deaconess Manor Ass'n</u>, 927 S.W.2d 395, 405 (Mo.App. E.D., 1996); <u>Vicorp Restaurants v. Corinco Insulating Co.</u>, 222 Ill.App.3d 518, 524, 584 N.E.2d 229, 234 (Ill.App. 1st Dist., 1991).  The term "acceptance" in the January 20, 2004, Letter does not show that the parties intended an "as is" contract.  An "as is" contract requires language showing an intent to accept the work without any warranties.  This requires language such as "as is" or "with all faults."  <u>See</u> <u>Harper v. Calvert</u>, 687 S.W.2d 227, 230 (Mo.App. W.D., 1984); <u>Lake Bluff Heating and Air Conditioning Supply, Inc. v. Harris Trust and Savings Bank</u>, 117 Ill.App.3d 284, 292-93, 452 N.E.2d 1361, 1367 (Ill.App. 2nd Dist., 1983).  None of the documents contain language like this.  This is not an "as is" contract.  As such, RTW had an

obligation to perform in a workmanlike manner.[5]

RTW is also not entitled to summary judgment on the theory that Ameren cannot prove RTW's breach. Ameren does not have to prove the breach to avoid summary judgment on RTW's claim; rather, RTW must prove that it performed its obligations under the contract. RTW alleges a claim for breach of contract. First Amended Complaint (d/e 16), at 2. To prove its claim, RTW must prove the parties entered into the contract; RTW performed its obligations under the agreement; Ameren breached the contract; and RTW suffered damages. Elson v. State Farm Fire and Cas. Co., 295 Ill.App.3d 1, 6, 691 N.E.2d 807, 811 (Ill.App. 1st Dist., 1998); Muir v. Ruder, 945 S.W.2d 33, 36 (Mo.App. E.D., 1997). RTW, thus, must establish that it installed the refractory in a workmanlike manner. Issues of fact exist regarding whether RTW performed this obligation. Something went wrong; the refractory fell off. The parties and their experts have opined about the reasons for the failure. None of these opinions are

---

[5]In addition, the additional terms and conditions in the 2006 Change Documents contain an express warranty of workmanship quoted above. The 2004 Purchase Agreement Change apparently was prepared on the same form as the 2006 Change Documents, and incorporated the additional terms by reference. Those terms are not in the copy filed in Court, but if: (1) the same terms were, in fact, attached, and (2) the 2004 Purchase Agreement Change is part of the agreement between the parties, then RTW may have given an express contractual warranty of its work.

dispositive.   The facts presented at summary judgment are that RTW installed the material; the heaters used in the cure process used more fuel to heat cyclone burners the first time; the product looked excellent when the cure was finished both times; Ameren tried to restart the Unit the first time, but it failed; after the cyclones cooled and were reopened, the refractory was falling off and the tubes were leaking.  After the second installation, Ameren continued to have some problems and had to patch some of the refractory. This evidence could point to defective installation and/or cure, or it could point to leaks in the tubes or improper operating procedures that damaged the refractory.  The undisputed facts do not establish which party, if any, is at fault; issues of fact clearly remain on RTW's claim.   Summary judgment is denied.

Ameren also alleges a counterclaim for breach of contract.  RTW is correct that Ameren will need to prove that RTW breached to prevail on this counterclaim.  RTW, however, is not entitled to summary judgment on the counterclaim because, as explained above, issues of fact exist regarding the reasons for the failure of the refractory.

THEREFORE, Plaintiff RTW Refractory, Inc.'s Motion for Summary Judgment (d/e 31) and Defendants Ameren Services Company and Ameren

Energy Generating Company's Motion for Partial Summary Judgment (d/e 32) are DENIED.    Defendants' Motion to Bar Plaintiff's Expert Witness–Donald McIntyre (d/e 33) is ALLOWED in part; and Defendants' Motion to Bar Plaintiff's Expert Witness–Michael O. Moseley (d/e 35) is ALLOWED.

IT IS THEREFORE SO ORDERED.

ENTER:    March 1, 2007.

      FOR THE COURT:

                    s/ Jeanne E. Scott
                    JEANNE E. SCOTT
            UNITED STATES DISTRICT JUDGE